Good morning all. Our first case for argument this morning is Corre Opportunities Fund v. Emmis Communications. Mr. Trella. Thank you, Your Honor, and may it please the Court. In September 2012, Emmis voted for two-thirds of its preferred stock in favor of an amendment to its Articles of Incorporation that was intended to and did strip away most of the value of that stock. The question on appeal is whether Emmis was entitled to vote the shares that it voted. Specifically, could it vote shares that it acquired in what it called total return swaps, and could it vote shares that it held for a newly created employee retention plan? Because Emmis needed every single vote to get to two-thirds, if either of these devices was ineffective to give it the right to vote, its vote to amend the Articles failed. Counsel, do we have diversity of citizenship in this case? Jurisdiction was based originally around... Would you just answer my question, and then we can get to the next question. Understood. I'm not certain that there's diversity of citizenship, Your Honor. It was not pled as a diversity case. It is certainly not alleged. Correct. So, jurisdiction rests, if at all, on federal question jurisdiction. But, of course, there's no federal question presented on appeal. Correct. And the District Court gave what seemed to me the back of her hand to the federal claims. I wonder whether they are substantial enough to support jurisdiction over the pendant claims. Well, Your Honor, I think they were certainly substantial enough. It's true that by the time of her summary judgment decision, she focused more on the state law claims than the federal claims. But earlier in the case, at the preliminary injunction stage, she devoted quite a bit of attention to the federal claims, the proxy and tender offer claims in particular. So, I don't think she... I'm really not... I don't think my question can be answered by figuring out how many pages the District Court spent on. I'm trying to figure out whether they are substantial or frivolous. Well, Your Honor, I would submit that they are not, by any stretch of the imagination, frivolous. And I would refer the Court, for example, to Emmes' letter to the SEC, the November 2011 letter. We rely on that in connection with the state law claims. But it also shows the great lengths to which Emmes went to explain... had to go to explain why the federal proxy rules and tender offer rules did not apply here. In addition, there were some substantial disclosure questions concerning transactions that plaintiffs alleged Emmes had in the works. They presented evidence to that effect. Now, the District Court decided against us on those claims, concluded that the evidence didn't show what we said it showed. But these were not frivolous evidence that there were communications and other contacts concerning these transactions that then transpired after the fact. Did I answer your question, Your Honor? Well, you gave your point of view. Whether you've answered my concern is a different matter. Understood. I also would note, Your Honor, that we didn't anticipate quite your question, but we did anticipate the question whether this where a case was decided on both state and federal grounds in the District Court, but only the state grounds were pursued on appeal, whether this court had ever concluded that there was a lack of jurisdiction. And we found no such case, and we did find some cases where the court, without discussing the issue, did proceed to address the state law claims. It doesn't completely answer your question, but it is pertinent to it, I think. Now, turning to the state law claims here, both of the devices that Emmes tried to use were ineffective. With respect to the total return swaps, the parties are in substantial agreement about the law. Under the statute in Emmes' articles, only outstanding shares can vote. Shares are outstanding unless and until the corporation reacquires them. At that point, the shares are retired, they're no longer outstanding, and they can't vote. Now, Emmes makes the point in its brief that Indiana corporate law is unique in certain respects, but no one suggests that there's any special Indiana definition of what it means to reacquire shares. To the contrary, the parties agree that shares are reacquired where the sellers part with the benefits and risks of stock ownership and have no further interest in the corporation. As Emmes put it at page 24 of its brief, the test is whether the holder of the shares before the transaction no longer has any rights in the shares after the transaction. And that's what happened here. The sellers in the total return swap sold every right they had in the preferred shares to Emmes for a one-time cash payment, and they were left with no further interest in those shares. Emmes reacquired the shares in those transactions and therefore couldn't vote them. Now, the retention plan shares are a little bit more complicated, in large part because Emmes' theory for why it had the authority to vote those shares is a bit of a moving target. The theory the authorized it to vote the shares it held for the retention plan. That statute, however, expressly refers to shares held in a fiduciary capacity, and Emmes doesn't even suggest that it held the preferred shares as a fiduciary. Rather, Emmes argues that it could vote those shares regardless of fiduciary capacity, but it doesn't explain how to reconcile that with the language of the statute. Now, Emmes alternatively argues that it didn't need any specific statutory authority for its vote because Indiana corporations have the general power to vote and deal in their own shares, but that's not correct, and Emmes doesn't really think it's correct. If that's what the statute meant, Emmes wouldn't have needed either the total return swaps or the retention plan or the attempted transactions with Zell and Canyon. It could have simply issued stock to itself and voted it, but no one has ever suggested that an Indiana corporation has the power to do that, and it would make no sense to say think it has that power because the statute provides, for example, that a shareholder, a corporation can't vote shares, its own shares that are held by a subsidiary, but it can vote it to say that it could then hold shares that it holds directly itself wouldn't make any sense, and the official comments to the business corporation law, which Emmes agrees are authoritative, expressly state that Indiana corporations can't vote their own shares. That's the comment to section 23-1-43-10. Unless Emmes held the retention plan shares in a fiduciary capacity, and it admittedly didn't, it couldn't vote those shares either, and so the vote to amend the articles was not legitimate. Now, Emmes argues in this court that it didn't reacquire the preferred shares in the swap transactions, but that's not what it told the SEC, its auditors, and the public at the time. The SEC, as I mentioned, looked into the total return swaps in November 2011 to determine, among other things, whether they were an effort by Emmes to obtain the right to vote shares held by, owned by somebody else, which would implicate the proxy solicitation rules. Emmes, which hadn't complied with those rules, sent the SEC a lengthy explanation to show that the proxy rules didn't apply because Emmes, in fact, had reacquired the shares. Emmes started by explaining, and this is our appendix, pages 187 to 196, Emmes started by explaining that it had purchased, that's its term, a total of 1,681,000 shares, and it included under the purchased umbrella both the shares that it purchased outright and the total return swap shares. It didn't say it had agreed to purchase those shares or that it will purchase those shares, it said it had purchased those shares. More specifically, Emmes told the SEC that the sellers had transferred all of the economic rights of the preferred stock to Emmes and also gave Emmes the right to direct the voting. According to Emmes, the arrangement had the same economic and voting effect as a purchase of such shares. The sellers, Emmes told the SEC, retained no voting or economic interest in the shares. The essence of the transactions, according to Emmes, was a purchase by Emmes of the economic and voting rights and privileges of the transfer of all of such holders economic and voting rights under the preferred stock to Emmes for cash. The transactions had the same effect as an outright purchase for cash because the sellers had no further interest in the preferred stock. They had relinquished all of their economic and voting interest. Now, Emmes also told the SEC that the transactions were sales for accounting, tax, and other reporting purposes, and it told the public the same thing in its financial statements, which treated the shares as repurchased and retired. Emmes argues that accounting or tax treatment doesn't necessarily reflect what really happened, and that's certainly true, but accounting and tax treatment, in fact, often do reflect exactly what happened. But more important for present purposes is why Emmes and its auditor decided that the shares should be accounted for as transactions. Emmes explained that the swap sellers had been paid full value, that they had no right to reacquire the shares, and no right to vote except as Emmes directed. The seller retains no rights to these securities. All have been irrevocably delegated to Emmes, and just compare that with what Emmes in its brief at page 24 says the standard is. The holders of the shares before the transaction no longer has any right in the shares after the transaction. That's what Emmes told its auditor, and that's why its auditor allowed it to account for the sales the way it did. The seller has no ability to obtain any economic benefit from these securities beyond the purchase price already paid by Emmes. They couldn't transfer the shares or enter into any transactions regarding the shares at any time. Mr. Trella, that was an arm's-length transaction, though, right? Yes. So that distinguishes it, doesn't it, from the You can't vote the shares in the subsidiary. Oh, well, yeah, I think that's true, Your Honor, but it doesn't go to the question of whether the sellers had relinquished all of their rights in the shares. I think that's the important point for this purpose, I think, is that, as Emmes told the SEC, as Emmes told its auditors, the sellers were left with nothing. Emmes had everything, which means that the shares were reacquired and thus no longer outstanding. That's the reason that they couldn't vote. It's not because of the, you know, the express prohibition on voting shares owned by a subsidiary. Well, I'm just trying to distinguish. The statute speaks in 23.122.26 about, you know, dealing with the shares except to the extent it's specifically prohibited by law, and I'm kind of searching for the specifically prohibited. Oh, okay, I understand. Well, I think you need to take a step back and look at the statute, that provision, in the context of the entire statute. Now, Emmes places a lot of weight on it in isolation, but so Section 23-1-30-2A says that only outstanding shares can vote. Now, shares that the corporation acquires, obviously they can't vote because they're no longer outstanding. So then you have to think about, okay, how else could the corporation be in a position to vote the shares? Section 2B, I'm abbreviating, 23-1-30-2B, that's the provision about subsidiaries, that says, well, you can't vote shares that are held by a subsidiary, and that was a provision adopted verbatim from the Model Act and the comment to the Model Act, which the Indiana official comments say, where we've adopted a provision verbatim, you should look to the Model Act comments. It says the reason for that is that you don't want a corporate management to be able to use a corporate investment, basically the subsidiary, to Well, I don't think that's what I'm saying, Your Honor. What I am saying is, if you can't vote the shares of a subsidiary, then you can't vote your own shares, so we should treat it as expressly prohibited, even though it isn't. No. Even though the critical word in, for me, in 23-1-22-2-6 is the word expressly. Understood, Your Honor, but you have to, what I'm suggesting, and obviously not doing it very artfully, I think you have to start from the proposition, okay, well, how could a corporation be in a position to vote its own shares? It can't buy them and vote them. There's no dispute about that. So how else could it do it? Well, the subsidiary thing we've talked about, and the only other way it could do it is, or there are other ways it could do it, if the shares were held by another entity, but the corporation was somehow in a position to direct the voting. The comments refer to, for example, a limited partnership of which the corporation is a general partner, where it would have a fiduciary duty. There's also the which talks about the employee benefit plan or in any other fiduciary capacity. The other ways it could, in your view, what does the reference in sub 23-1-22-2-6, what does it do? What you really want us to do, I think, is look at 23-1-32 and pay little attention to the other one. I'm trying to figure out what it does in your view. What it does, for example, is it says that if you have, if the corporation arranges for a shareholder agreement that gives it the power to vote shares that are actually owned by somebody else, so they're outstanding, it can vote those shares. It can vote shares subject to, when it holds shares in a fiduciary capacity, but it can't vote shares that it owns itself, because those have been reacquired and therefore they are no longer outstanding. So I don't think, we don't read 2-6, I'll abbreviate, as some sort of a freestanding authorization to vote shares regardless of everything else. You have to first come to the conclusion. If it is otherwise prohibited, then obviously you can't vote them. Right. That drives you to the search for what otherwise prohibits it. Well, but it also drives you, your honor, to the, I think, to figure out, well, how can the corporation be voting these shares? It doesn't own them. In the case of the, in the case of the total return swaps, it has reacquired those shares. That's really the issue. There's, and there's no dispute about that, that a corporation cannot, notwithstanding 2-6, a corporation cannot vote shares that it has reacquired because they're no longer outstanding. So that's really the core issue here. So I don't think, certainly as to the total return swap transactions, your honor, we're not suggesting that the court should ignore 2-6 or not give it appropriate weight. What we are suggesting is that, in truth, it is otherwise prohibited, because where the shares have been reacquired, as they were here in the swap transactions, there is no right to vote them. Now on the, if I could turn very briefly to the, the actual terms of the swap transactions, there's really not much dispute there, that if you work your way through the agreements, Emmes acquired all the economic interests, no, the, the sellers could not receive any dividends, it acquired all the voting interests, there were irrevocable proxies, that, that, so Emmes controlled the vote and that's consistent with what it told the SEC and its auditors. On the retention plan, the, the statute 2C says that an, an issuer can vote its own shares held by it in or for an employee benefit plan or in any other fiduciary capacity. Now Emmes wants to avoid, wants to ignore the other fiduciary capacity language. But it's in there for a reason. And, and it, it is specifically because the, the underlying policy here, it's the same policy underlying 2B, which is you don't want corporate management in a position to be voting corporate shares to perpetuate itself in office. Now where there's this independent fiduciary duty, you don't have that concern, which is why that language is in the statute. I see that I'm into my rebuttal time, so I would like to reserve the rest of it. Thank you. Thank you, Mr. Trello. Mr. Shockley? Good morning. May it please the court. I think the focus on section 30-2B is appropriate. It demonstrates how far a corporation can go in dealing in its own shares. 30-2B, and I'm sorry, everything I refer to is 23-1-unless I say something else. But 23-2B is a narrow prohibition. It's the only specific prohibition against a corporation voting its own shares. And it provides that absent special circumstances, a corporation cannot, is not entitled to vote shares that are held by its controlled subsidiary. It doesn't say those shares are no longer outstanding, which is the question with the TRS shares. It says they're not entitled to vote. 2B is an exception. Do you have any idea what the special circumstances this refers to could be? Yes, the RMA comment indicates that special circumstances are where the vote is for something other than the subsidiary. It could have elected its own board of directors as the directors of the subsidiary, caused the subsidiary to purchase outright preferred shares from preferred shareholders, and it could have voted those shares, and the only issue would be whether special circumstances were present or not. There would be no question about whether those shares remained outstanding. That's the import of the counterparties, obviously, not EMIS's subsidiaries, and therefore those shares remained outstanding. Because they were outstanding, they were entitled to vote. The counterparty's vote was exercised by the proxy at EMIS's direct. Another way to know what reacquired means, for purposes of the TRS shares, again, shares are outstanding until they're reacquired or redeemed, converted, or canceled. If you want to know what reacquired means, look at the words around it. Redeemed, converted, canceled. In each of those transactions, after the transaction is over, the former shareholder has nothing. They don't have record ownership. They don't have beneficial ownership. In the case of a So if you want to know what reacquired means, it must, in context, mean the same thing. That the shareholder has given up both record ownership and beneficial ownership. This is consistent with the bundle of sticks metaphor that was used in the brief. The two big sticks of a share are record ownership and beneficial ownership. The statute draws a bright line between the two, but they are both proprietary interests in the corporation. In the TRS transaction, the parties disaggregated the shares. EMIS got the purely contractual beneficial ownership rights to acquire the shares in the future, to vote the shares in the meantime, and to receive the economics of the shares until the TRS transactions were wound up. The counter parties received record ownership, which they agreed to retain for up to five years, which gave them the statutory power of a shareholder to vote the shares in person, to contract the vote by proxy, or to enter into an enforceable shareholder agreement with another shareholder. The counter parties also received the beneficial ownership right to dispose of the shares back to EMIS to require EMIS to take back everything in the event of a delisting or other extraordinary event under the TRS confirmation. In addition, the counter parties retained the right to vote the shares, but entitled them to vote the shares nonetheless. So if you want to know what reacquired means, look at the context. That context indicates that the shareholders have given up everything. The counter parties did not give up everything. They retained both record ownership and beneficial ownership rights. Therefore, the shares remained outstanding, and therefore they remained entitled to be voted by the counter parties, by proxy, at EMIS's direction. If I can turn to the plan shares, the question, I agree, is whether 30-2c is a specific prohibition on a corporation's power to vote its own shares. Clearly, 30-2c was not intended by the legislature to be a prohibition at all. It begins with the words, subsection B, which is a reference to the parent subsidiary situation. Subsection B does not limit the power of a corporation to vote its own shares, etc. Those are not the words of prohibition. In fact, if you look at the official comment to 30-2c, it says that the words that were added to the statute, the words that were added were from the RMA version, which served as the model, the words that were added were in or for an employee benefit plan or in any other, includes the word other. The official comment says that those words, including the word other, were added to the RMA language, quote, to state expressly that a corporation has the right to vote shares held by it in or for an employee benefit plan. That is not a prohibition. That is an explanation of the right that exists. If fiduciary capacity were to be required even for shares held for an employee benefit plan, then the language of the RMA, which was altered by the Indiana legislature, would have sufficed. The RMA counterpart says subsection B does not limit the power of a corporation to vote any shares, including its own, held by it in fiduciary capacity. Had the legislature intended fiduciary capacity to be a limit on a corporation's power to vote its own shares in an employee benefit plan, that language would have been entirely sufficient. Furthermore, given the business judgment rule in Indiana, which says that a director is to exercise its business judgment in the best interest of the corporation as a whole, it may give consideration to vendors, customers, the communities in which the corporation is located, that the business judgment of a director is to be exercised in the best interest of the corporation, but none of those factors need be considered the dominant or controlling factor. If fiduciary capacity were required for shares held in an employee benefit plan, then that could be construed to require directors to place more emphasis on the rights of the employee beneficiaries of the plan than the business judgment rule would support. So it's clear to us that fiduciary capacity was not required for EMS to direct the vote of the shares in the employee benefit plan. In Indiana statutes, isn't this, I mean, my recollection is somewhat dated probably, but referring to legislative history and the Supreme Court acknowledging that these official comments are authoritative, is that, it runs contrary to past history of Indiana legislative history. Yeah, in general, legislative history simply isn't available in that especially where the IBCL language makes significant departure from the RMA language, the official comments are a guide to the purpose, the policy, the construction, and understanding of the statute. So it's especially significant that the comment to 30-2C makes the point that the purpose is to express the right of a corporation to vote shares held in an employee benefit plan. As I said, fiduciary capacity is not required. However, it was plainly present. EMS issued the shares to a validly created trust. The relationship of trust is a fiduciary capacity. The contours of the fiduciary obligations were not employee benefit trust. The trustee's obligation was to administer the plan according to the terms of the trust, which it did. I have some time left, but if there are no further questions, I have nothing more to say. Thank you, Mr. Shockley. Just a few points, Your Honor. On the retention plan, counsel did not explain the words other fiduciary capacity in the statute. What the comment says is that the Indiana legislature added the words employee benefit plan or other to make express that employee benefit plans were covered by the It was not to add something that was not covered by other words or other fiduciary capacity wouldn't make any sense. On the record ownership point, that really begs the question. The question is not whether somebody's name appears on a shareholder list. The question is whether that actually reflects any true ownership interest, any of the rights or benefits or risks of ownership of the shares. Now, counsel referred to the right, the shareholder's right to vote under the statute. Well, certainly that's a right of a shareholder under the statute, but the shareholder sold that right to Emmes as part of this transaction. The voting agreement, the confirmation agreement, and the securities purchase agreement are all interrelated. They are expressly contingent on one another, and they all form part of the same transaction. So, yes, shareholders have the right to vote, but that was one of the rights, a major right, that these shareholders sold to Emmes in these transactions. And it's not true that the shareholders, even under limited circumstances, retain the right to vote their shares. They agreed to two things. One is that they would take no action except as Emmes directed. The other was that they would do what Emmes directed them to do. Now, there's an exception to the latter part that, you know, if Emmes told them to vote in a way that would violate the law, they didn't have to do that, or if it would require them to participate in the first one, they could not decide to vote the way they wanted to vote, no matter what. They could only respectfully decline to do what Emmes told them to do if it would violate the law or somehow require them to participate in litigation. So they had no voting rights. It's undisputed that they had no economic rights, and there really are no other rights that were remaining with these selling shareholders. So under Emmes's own test, that you look before the transaction, you look after the transaction, there was nothing left with these shareholders. Thank you, Your Honor. Thanks to all counsel. The case is taken under advisement.